**J.W.C. DAVIS and Gwendolyn Davis, Plaintiffs–Appellants and Cross–Appellees,**

v.

**R.K. CRAMER, Richard Haines, Irene M. Light, Louis S. Madrid, Gary Sandlin, and Sandlin Oil Corporation, Defendants–Appellees and Cross–Appellants.**

No. 87CA1627.

Colorado Court of Appeals, Div. I.

Feb. 27, 1992.

As Modified on Denial of Rehearing April 2, 1992.

Certiorari Denied Oct. 13, 1992.

Samuel L. McClaren, P.C., Samuel L. McClaren, Tucson, Ariz., for plaintiffs-appellants and cross-appellees.

Burns, Wall, Smith and Mueller, P.C., George W. Mueller, Donald D. Farlow, Denver, for defendants-appellees and cross-appellants.

Opinion by Judge PIERCE.

This case returns to us pursuant to a mandate by our supreme court in *Davis v. Cramer*, 808 P.2d 358 (Colo.1991), in which that court reversed our decision in *Davis v. Cramer*, 793 P.2d 605 (Colo.App.1990). We now affirm that portion of the judgment of the trial court terminating the lease, reverse the determination of damages, and remand.

A brief overview of the facts and case progression is helpful to an understanding of the current posture of the case.

Plaintiffs, Gwendolyn and J.W.C. Davis, are the owners in fee simple of the southwest quarter of section 2, Township 3 south, Range 64 west, 6th P.M., and the southeast quarter of section 30, in Township 2 south, Range 63 west, 6th P.M., in Adams County, except a one-half mineral interest in the southeast quarter of section 30 which was reserved by the Allensworths, plaintiffs' predecessors-in-interest.

On November 1, 1968, the parties executed the Davis lease. This oil and gas lease covers the southwest quarter of section 2 and the southeast quarter of section 30, excepting the one-half mineral interest reserved by the Allensworths. Defendants are lessees who also have right of access under the Allensworth lease. The stated purpose for the Davis lease is "mining, and operating for oil, gas, and other minerals, laying pipe lines, buildings, tanks, power stations and structures thereon, to produce, save and take care of said products...."

The habendum clause to the lease provides for a primary term of 10 years and "as long thereafter as oil or gas or other minerals are produced from said land by lessee." As is pertinent here, the lease also contains a shut-in royalty clause which will be described later. Also, as pertinent here, the lease contains a drilling clause which calls for payment of a delay rental for the privilege of deferring for 12 months commencement of a well or the drilling of a second well after finding a dry hole.

In March 1978, plaintiffs filed their amended complaint alleging, among other things, breach of express covenants of the lease and breach of the implied covenants of prudent operation and of further exploration and development. Defendants counter-claimed, seeking damages for plaintiffs' refusal to allow them access to drill on the southeast quarter of section 30.

The trial court concluded that the lease terminated on November 1, 1974, for lessee's failure to pay shut-in gas royalties after November 1, 1973, during the primary term of the lease, and for breach of the implied covenant to market the gas within a reasonable time. The trial court further found that, in any event, the lease terminated in 1975, for the lessee's failure to utilize the available pipeline.

On appeal, this court concluded that since the well was producing gas upon expiration of the primary term, the trial court had erred in finding that the lease had expired. Thus, according to our prior opinion, the habendum clause was satisfied and the lease continued into its secondary term indefinitely, so long as there was continued production of oil or gas or minerals.

In reversing this court's opinion, the supreme court held that the implied covenant to market arises during the primary term of the lease. Accordingly, upon remand, we have been directed to determine whether the lessees exercised reasonable diligence to market the gas during the primary term in accordance with their implied duty and, if not, whether cancellation is the appropriate remedy. To resolve this issue, it is necessary for us to determine the effect of the shut-in royalty clause on lessees' implied duty to market the product.

Finally, the supreme court held that the findings of the trial court are sufficient to determine whether, factually, lessees satisfied the drilling and dry hole clauses of the lease and we must determine the legal issues involved.

## I.

### A. Habendum Clause

An habendum clause in an oil and gas lease describes the duration of the interest granted. 5 E. Kuntz, *Oil & Gas* § 46.6(b) (D. Dunn ed. 1989). Jurisdictions vary as to what is required to satisfy an habendum clause. If marketing is not an essential part of production, the habendum clause is satisfied by commercial discovery of the product. 5 E. Kuntz, *Oil & Gas* § 60.1 (D. Dunn ed. 1989). In jurisdictions in which marketing is an essential part of production, the habendum clause requires that the product be removed from the earth, which necessarily involves marketing where the product is gas, and reduced to possession for use in commerce. 5 E. Kuntz, *Oil & Gas* § 60.1 (D. Dunn ed. 1989); *Christian v. AA Oil Corp.*, 161 Mont. 420, 506 P.2d 1369 (1973).

Here, the trial court found that the well was producing in paying quantities within the primary term of the lease, which was sufficient to satisfy the habendum clause. Therefore, the trial court implicitly ruled that marketing is not an essential part of production, and the habendum clause is satisfied by discovery in commercial quantities. There is nothing in the lease itself or in the relevant case law in Colorado to indicate this finding is not correct. *See Davis v. Cramer, supra* (Colo. 1991); *see also Hoff v. Girdler Corp.*, 104 Colo. 56, 88 P.2d 100 (1939) (production without marketing during the primary term is not alone sufficient to declare abandonment of the lease absent breach of the implied covenant to market).

### B. Implied Covenants

The duties imposed by implied covenants recognize that the fundamental purpose of an oil and gas lease is the exploration and development of the leased premises. 5 E. Kuntz, *Oil & Gas* § 55.2(a) (D. Dunn ed. 1989). Implied within each oil and gas lease are four covenants. These are the covenants to drill or explore, to develop after discovery in paying quantities, to protect against drainage, and the covenant of diligent and prudent operation.

Contained within the covenant to operate prudently is the duty to market the product. *Mountain States Oil Corp. v. Sandoval,* 109 Colo. 401, 125 P.2d 964 (1942); 5 E. Kuntz, *Oil & Gas* § 55.1(c) (D. Dunn ed. 1989); 1 E. Brown *The Law of Oil & Gas Leases* § 16.02 (2d ed. 1991).

The implied duty to market the product is an obligation imposed upon a lessee which requires him to make diligent efforts to market the product in order that the lessor may realize a return on his royalty interest. This is because the lessor's chief return is secured from rents and royalties dependent upon operation. Thus, the lease implies that, if gas is found, the wells will be operated and the production will be sold. *Wolfe v. Texas Co.*, 83 F.2d 425 (10th Cir.1936).

The performance required to comply with the implied duty to market is that of a prudent operator. The duty arises when oil and gas is produced in paying quantities, 1 E. Brown *The Law of Oil & Gas Leases* § 16.02(4)(A) (2d ed. 1991), and this duty requires the lessee to exercise reasonable diligence, having regard for the interests of both parties, to begin marketing the product within a reasonable time after completion of the well. 5 E. Kuntz, *Oil & Gas* § 60.3 (D. Dunn ed. 1989); *McVicker v. Horn, Robinson & Nathan,* 322 P.2d 410 (Okla.1958). Marketing includes the sale of the product and payment to the lessor of his portion.

A determination of whether the lessee was diligent and whether the gas was marketed within a reasonable time are based upon equitable considerations regarding the particular facts of the case. *Bristol v. Colorado Oil & Gas Corp.*, 225 F.2d 894 (10th Cir.1955). Thus, the question of breach of the implied covenant is primarily one of fact. *Davis v. Cramer, supra; Mountain States Oil Corp. v. Sandoval, supra.*

Whether the lessee exercised the diligence proper under the circumstances to operate the lease is determined by "whatever, in the circumstances, would be rea-

sonably expected of all operators of ordinary prudence, having regard to the interests of both lessor and lessee." *Davis v. Cramer, supra* (Colo.1991); *see also Strange v. Hicks,* 78 Okla. 1, 188 P. 347 (1920).

The constant failure regularly to pay the royalties stipulated in the lease is a factor having some bearing on this determination. *Mountain States Oil Corp. v. Sandoval, supra.*

Other relevant factors in determining whether the lessee exercised due diligence to justify his failure to market the product include the absence of a market and the diligence of a lessee in seeking a market, the failure of the lessor to make a demand, the acceptance by a lessor of other benefits under the lease, whether it was necessary to make abnormal expenditures to market the product, and whether the delay was to gain better marketing terms. 5 E. Kuntz, *Oil & Gas* § 60.3 (D. Dunn ed. 1989).

Here, although explicit findings were not made by the trial court on this issue, our resolution of the breach and remedy problems later in this opinion make remand for these findings unnecessary because the final conclusions of the trial court imply the necessary findings.

The question of what is a reasonable time is also a factual determination and reflects upon the diligence of lessee's efforts. Generally, however, an oil and gas lessee should not be allowed to hold his lease indefinitely while no product from the lease is being marketed and while diligent efforts are not being made to accomplish this. *McVicker v. Horn, Robinson & Nathan, supra.*

### C. Shut–In Royalty Clause

A shut-in royalty clause modifies the habendum clause, 5 E. Kuntz, *Oil & Gas* § 45.6 (D. Dunn ed. 1989), and may therefore affect the duration of the interest and the diligence required to preserve it. A shut-in royalty clause generally provides that, if there is no market for the products of a gas well, the lease may be continued in force by payment of a shut-in royalty. 1 E.

Brown *The Law of Oil & Gas Leases* § 6.08 (2d ed. 1991). In effect, then, a shut-in clause provides for "constructive production," which ensures further exploration and allows the lessor to collect royalties while there is no market. *Pray v. Premier Petroleum, Inc.,* 233 Kan. 351, 662 P.2d 255 (1983).

A determination of the effect of a shut-in royalty clause upon other relevant lease provisions depends upon construction of the clause itself and, in particular, upon whether marketing is required to satisfy the habendum clause. 5 E. Kuntz, *Oil & Gas* § 46.1 (D. Dunn ed. 1989).

Here, where commercial discovery is sufficient to continue the lease under the habendum clause, the shut-in clause is not necessary to extend the lease beyond its primary term if gas is not marketed, and it does not operate as a special limitation, to extend the term of the lease. Rather, the lease is extended with or without the shut-in clause subject to forfeiture for failure to comply with the implied obligation to market the product. 5 E. Kuntz, *Oil & Gas* § 46.3(a) (D. Dunn ed. 1989); *Gard v. Kaiser,* 582 P.2d 1311 (Okla.1978).

In this situation, a shut-in royalty clause can be inserted to provide an additional special limitation, which requires payment of the shut-in royalty if gas is not marketed. It may also be inserted to prevent forfeiture for failure of the lessee to exercise diligence in marketing, may extend the reasonable time within which the lessee is required to market the product, or may remove doubt regarding the time within which marketing must be accomplished, or it may serve to compensate the lessor for delay by payment of the royalty. 5 E. Kuntz, *Oil & Gas* § 46.1 (D. Dunn ed. 1989). Construction of the shut-in royalty clause may affect the remedy to which the lessor is entitled and may also remove the question of diligence in seeking a market for the payment. 5 E. Kuntz, *Oil & Gas* § 46.5(b) (D. Dunn ed. 1989).

The shut-in royalty clause in this case provides that "when no reasonable or convenient gas market is available, lessee

may pay $1 per acre per annum for the total acres allotted to each while held as a shut-in well."

█ The cursory language of this clause does not lend itself easily to a determination of its intended effect. If a shut-in clause is to serve as an outer limit upon a period of time during which marketing can be deferred, it must provide for a limit beyond which the lease cannot be held by payment of a shut-in royalty. 5 E. Kuntz, *Oil & Gas* § 46.3(b) (D. Dunn ed. 1989). There is no such language here.

From the language here, we may discern that payment of the shut-in royalty is optional and the shut-in clause is therefore not the exclusive method for maintaining the lease in force. *See* 5 E. Kuntz, *Oil & Gas* § 46.5(a) (D. Dunn ed. 1989). Also, the provision for payment of the shut-in royalty here was added as an additional paragraph to the royalty clause, which makes its most logical construction as that of a covenant, 5 E. Kuntz, *Oil & Gas* § 46.3(c) (D. Dunn ed. 1989), although it is not a mandatory obligation to pay.

█ Thus, the trial court erred in declaring that the shut-in gas royalty clause operated here as a special limitation, necessary to keep the lease in force during the original term. The lease did not terminate for failure to pay the shut-in royalties since the shut-in well was producing in paying quantities to satisfy the habendum clause. However, this does not excuse the lessee from his duty to search diligently for a market and to otherwise conduct himself as a reasonably prudent operator. *See Pray v. Premier Petroleum, Inc., supra.*

### D. Breach

We must now determine whether, in light of these principles, the implied covenant to market the product was breached.

█ Lessees are in compliance with the habendum clause. Thus, the lease continues in effect unless it terminates for another reason or under another provision of the lease. *See* 5 E. Kuntz, § 46.1 (D. Dunn ed. 1989). Since marketing is not required to satisfy the habendum clause here, the lan-

guage of the lease will not terminate the shut-in well during the period that a lessee is diligently seeking a market. Rather, the implied duty to market means that lessee has a reasonable time after completion of the well to comply with the covenant. *Gard v. Kaiser, supra.*

█ Here, there is no date in the shut-in royalty clause which would remove the doubt regarding the time within which marketing must be accomplished. Thus, compliance with the implied covenant to market is measured by factors bearing on the factual considerations of lapse of time and the diligence of the operator. *Bristol v. Colorado Oil & Gas Corp., supra.* The well here was completed in 1972 and was then capable of production in paying quantities for purposes of the habendum clause, a pipeline came into existence less than ¾ of a mile from the Davis well in 1975, and the product was not marketed until 1978 when the well was ultimately connected to the pipeline.

The trial court heard conflicting evidence as to lessee's efforts and as to when a market became available for the product. There is nothing in the record to indicate that the trial court erred in finding a breach of this implied covenant, or which would excuse this inordinately long delay. *See Bristol v. Colorado Oil & Gas Corp., supra; see also* 5 E. Kuntz, *Oil & Gas* § 60.3 (D. Dunn ed. 1989).

Since there is support in the record for the trial court's findings, these findings will not be disturbed on review by this court. *Johnson v. Smith,* 675 P.2d 307 (Colo.1984).

### E. Remedy

█ Lessees argue that the failure to market is a passive breach which requires the lessor to place the lessee in default by making demand before seeking cancellation or forfeiture. However, if we assume this characterization, the absence of demand is simply a factor in determining whether there was unreasonable delay in marketing. 5 E. Kuntz, *Oil & Gas* § 60.4 (D. Dunn ed. 1989). And, the trial court

found that statements made by plaintiffs in late 1977 or early 1978 "were sufficient to apprise [defendants] that plaintiff considered the Davis lease to have terminated." *See North York Land Associates v. Byron Oil Industries, Inc.*, 695 P.2d 1188 (Colo. App.1984).

Thus, failure to comply with the implied obligation to market the product may justify cancellation of the lease. *Townsend v. Creekmore–Rooney Co.*, 332 P.2d 35 (Okla.1958).

■■■ Although there is a division of authority as to whether the equitable remedy of cancellation is favored, 5 E. Kuntz, § 60.5 (D. Dunn 1989), it is generally accepted with regard to oil and gas leases that forfeitures are favored. *See Christian v. AA Oil Corp., supra; see also Pryor Mountain Oil & Gas Co. v. Cross*, 31 Wyo. 9, 222 P. 570 (1924). Likewise, it is recognized in Colorado that a breach of the implied covenants in an oil and gas lease generally leaves no adequate remedy at law. *Gillette v. Pepper Tank Co.*, 694 P.2d 369 (Colo.App.1984) (*overruled on other grounds* in *Davis v. Cramer, supra* ).

■■■ If a lessee fails to market the product for an extended period without explanation, the lessor has made a *prima facie* case for cancellation. *Townsend v. Creekmore–Rooney Co.*, 358 P.2d 1103 (Okla.1960).

Here, lessees failed to market the product for six years after the completion of the well and an ascertainment of production in paying quantities, and for three years after completion of a nearby pipeline. Further, the primary consideration for the lease was the expectation that royalties would result from the mining and operation and production and marketing of gas or oil.

In this situation, cancellation of this lease in an action to quiet title is an appropriate remedy for lessees' breach of the implied covenant to market the product. *See Graefe & Graefe, Inc. v. Beaver Mesa Exploration Co.*, 635 P.2d 900 (Colo.App. 1981) (cancellation for breach of implied covenant of further exploration); *see also*

*Dulin v. West*, 35 Colo.App. 6, 528 P.2d 411 (1974).

## II.

### Compliance with Implied Covenants

■■■ If the purpose of an oil and gas lease is disclosed in the lease, the law implies duties in the lessee to do acts necessary to accomplish this purpose. *Davis v. Cramer*, 808 P.2d 358 (Colo.1991). Oil and gas leases are to be construed most favorably toward development, *Mountain States Oil Corp. v. Sandoval*, supra, and are construed liberally in favor of the lessor and strictly against the lessee. *Christian v. AA Oil Corp.*, supra.

## III.

■■■ Since both parties stipulated, and the trial court found, that the well was commenced within one year of entry into the lease agreement, we conclude that the plain language of the drilling clause was satisfied.

## IV.

Our original opinion addressed, as is relevant here, the trial court's finding that the lease had terminated and the trial court's measure and calculation of damages. Writ of certiorari was granted only as to Part I of that opinion, which is the portion that resolved the issue of lease termination. Accordingly, the remainder of our opinion and, specifically, its finding that defendant lessees are bad faith trespassers, remains binding on the parties. *See In re Marriage of Rappe*, 650 P.2d 1352 (Colo.App.1982) (action which terminates proceedings is final and effective from that date forward).

We, therefore, now amend our earlier disposition of this dispute and order that, on remand, the trial court should recalculate damages on plaintiffs' trespass claim without deductions for extraction costs.

The trial court's judgment terminating the lease is affirmed. In accordance with our earlier opinion, the trial court's determination of damages is reversed, and the cause is remanded with directions for a

recalculation of damages as set forth here-in.

TURSI and HUME, JJ., concur.